UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
- - - - - - -

UNITED STATES OF AMERICA,

               Plaintiff,              No.  1:23-CR-87

        vs.                       Hon. Jane M. Beckering
                                  U.S. District Judge

EVERETTE JHAMAL THIBOU,

               Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

This case involves a scheme to defraud elderly victims in the Western District of Michigan and other states across the country.  For the victims, the scheme began when they received a pop-up alert on their computer, an unsolicited email, or phone call advising them that their bank accounts had been compromised, or that their computers had been hacked.  Once the initial contact was made, conspirators located overseas followed up with the victims by telephone, typically by using voice-over-internet-protocol (VOIP) technology to make it appear that the telephone calls originated from area codes within the United States.

After establishing a rapport with the victims over the phone, the conspirators overseas used a variety of pitches to convince victims to give money to members of the conspiracy.  In one version, victims were falsely told that their bank accounts had been compromised and they needed to withdraw all of their cash and turn it over to fake "federal agents" for safekeeping.  In another version, victims were told that their computers had been infected by a virus and they needed to pay for technical support.  In a third version, victims were told that they had been identified in a criminal investigation and needed to turn over money to clear their names.

Thibou and the other defendants named in the indictment are the U.S.-based members of the conspiracy who collected money from the victims at the direction of the co-conspirators based overseas. A number of different methods were used, depending on which version of the pitch succeeded in defrauding the victims.  This included in-person meetings with victims to collect packages of cash, accepting delivery of mail packages of cash, or opening of bank accounts for the deposit of fraud proceeds.

From October 2021 through March 2022, Thibou recruited money mules, called "runners," to travel throughout the United States to collect money from elderly victims of the fraud scheme. (ECF # 349, PSR ¶ 178.)   Extensive evidence from witnesses and Thibou's phones show that Thibou "managed" the runners' activity on behalf of the conspiracy:   He directed them where to go to meet victims, made their travel arrangements, purchased their plane tickets, and provided victim information and location to the runners.  (*Id.* at ¶¶ 177-78.)  Thibou was in frequent contact with high-level members of the conspiracy in India, including "Jason" and "Gabi."  (*Id.* at 178.) Once the conspirators had a U.S.-based fraud victim convinced to withdraw cash and give it to the conspiracy, the conspirators in India contacted Thibou to arrange for runners to retrieve the cash, either through face-to-face meetings, or through the mail. (*Id.*) Thibou told the conspirators in India what runners were going to pick up the fraud proceeds.  He also collected fraud proceeds from the runners and arranged for the deposit of fraud proceeds in various bank accounts.  (*Id.*) He was the main intermediary between the conspirators in India and the runners.  (*Id.* ¶ 118-119, 125, 129.)

Thibou knew the victims were elderly, as shown by a January 28, 2022, text message exchange with co-conspirator Jmyla White.  On that date, Ms. White sent Thibou a message that

said, "Say something to make me feel better." Thibou responded, "There [sic] stealing from old white people an [sic] they eating big.  An helping me you and your daughter." (*Id.* at n.29.)

Thibou is responsible for causing $3,200,549 in actual loss to 29 elderly victims based on his own actions and the reasonably foreseeable loss of his co-conspirators.[1] (*Id.* at ¶179.) Throughout his time in the conspiracy, Thibou was serving a term of probation for a prior conviction for defrauding an elderly couple in Pennsylvania. (*Id.* at ¶¶ 227-230).  Indeed, his prior conviction barely slowed him down at all: the Pennsylvania conviction is dated August 10, 2021, and he joined the conspiracy in the instant case less than three months later.  (*Id.*)

Thibou recruited Ms. McNamara into the conspiracy, introduced her to Jayesh Panchal, and arranged for her visits to Irons, Michigan, to steal $398,000 from victim J.K., who was 70 years old.  (*Id.* ¶¶ 28, 30-31, 33, 35. 153, 157.)  The break in the case came when J.K. wrote down the license plate of the car that McNamara took to the meeting place.  (*Id.*  ¶ 161.)  The car came back as an Avis rental car in the name of Jayesh Panchal. (*Id.*)  An analysis of Panchal's phone calls during the days when J.K. met with conspirators showed that he was in contact with two phone numbers: one belonging to McNamara, and one belonging to Thibou.  (*Id.*)  A search of McNamara's phone showed that she had saved a news article about Thibou's Pennsylvania arrest for defrauding an elderly couple.  (*Id.*)

Thibou also recruited Jorrel Jackson and Jmyla White into the conspiracy.  Between October and December 2021, they defrauded victim N.P., age 69, out of $147,000.  (*Id.* ¶ 166.) Thibou arranged for Jackson and White to collect from proceeds from N.P.  (*Id.*)  N.P. also wired

---

[1] The loss amount for victim E.L. was incorrectly listed in  ¶¶ 179, 201, and 282 of the PSR as $447,700 instead of the actual amount of $47,700.  However, the overall loss and restitution amount is accurately listed as $3,200,549 throughout the PSR.

$9,000 into an account in Thibou's name.  (*Id.*)  On December 9, 2021, N.P. withdrew $35,000 in cash from her bank account and traveled to a restaurant in Charlotte, North Carolina, where she handed the cash to Jackson.  (*Id.*)  Cellular tower records place Jackson and Thibou in the vicinity of the meeting location on that date.  (*Id.*)  Jackson gave the box of fraud proceeds to Thibou, who turned it over to another member of the conspiracy.  (*Id.*).

Between November 2021 and February 2, 2022, Thibou, White, and Jackson defrauded P.D., a 66-year-old retired cardiac surgeon, of $475,000.  (*Id.*¶ 168.)  Thibou arranged for White, Jackson, and other members of the conspiracy to collect the fraud proceeds from P.D.  (*Id.*)  P.D. shipped a package of cash to a Walgreens pharmacy, which Thibou arranged for Jmyla White to retrieve.  (*Id.*¶ 61.)  On December 17, 2021, she met Mr. Jackson twice to hand him packages of cash at a grocery store in Auburn, California.  (*Id.* ¶ 62-63.) Thibou flew with Jackson to California then drove him to meet with P.D. and collect $70,000 in cash from her.  (*Id.* ¶169.) To help Jackson recognize P.D., Thibou sent Jackson text messages with P.D.'s name, vehicle registration, clothing description, and the address of the grocery store.  (*Id.*)  Thibou also provided Jackson with the pass code and name "Oliver Davis," the same name that McNamara used when she interacted with J.K. (*Id.*)  After he collected the boxes from P.D., Jackson turned them over to Thibou.  (*Id.* at ¶ 169.) Jackson said that, during these interactions, Thibou spoke on the phone to members of the conspiracy in India.  (*Id.*)

Victim J.R., age 76, of Seattle, Washington, lost $40,000 to the conspiracy after he was instructed to withdraw cash and mail it to various locations.  (*Id.* ¶ 58-59.)  Thibou arranged for Ms. White to pick up the packages J.R. mailed. (*Id.*)  On February 12, 2022, Victim R.T., age 77, of Star Valley Ranch, Montana, wired $44,493.82 to a Navy Federal Credit Union account in Jorrel Jackson's name.  (*Id.*¶ 68.)  On that same day, Thibou sent a text message with the Navy Federal

4

Credit Union account number to a phone number with an Indian country code.  (*Id.*)  He and the Indian co-conspirator then exchanged numerous text messages about the wire transfer, including a screenshot of R.T.'s computer, his name, address, and phone number. (*Id.*)

Thibou also recruited numerous unindicted co-conspirators, and directed their activity once they joined.  (*Id.* ¶¶ 170-76.)  When lower-level conspirators like Jackson recruited members of the conspiracy, such as his girlfriend and the exotic dancer "Vicky," Thibou took over management of the new recruits' activities once they joined.  (*Id.* ¶¶112, 114-115.)

White said that Thibou was involved with her in stealing money from the Indians.  (*Id.* ¶ 126.)  Text messages between White and Thibou confirm that he kept half of the proceeds that they stole from the conspiracy.  In the following text messages, "Bill Thomas" is Thibou and "Cat" is Jmyla White:





\* \* \*

Pursuant to a plea agreement with the government, Thibou pled guilty to the single count indictment on July 9, 2024.  The presentence report determined that his offense level is 31 based on the loss figure noted above, plus enhancements because the offense caused substantial financial hardship to 13 victims (USSG § 2B1.1(b)(2)(B)), a substantial part of the scheme was committed outside of the United States (§ 2B1.1(b)(10)(B)), Thibou knew the offense involved vulnerable victims (§ 3A1.1(b)(1)), and Thibou was manager or organizer (§3B1.1(b)).  (PSR, ¶¶ 187-199.)

Thibou has 10 prior adult criminal convictions and a criminal history score of 11, which places him in criminal history category V.  The resulting Sentencing Guidelines range is 168-210 months.  There are no factual objections to the presentence report, but there is an objection to the loss calculation, which is addressed below.

<u>Argument</u>

**I.     Thibou was a manager or supervisor of the conspiracy.**

Thibou objects to the presentence report's determination that he should receive a three-level enhancement pursuant to USSG § 3B1.1(b) for being a manager or supervisor of the conspiracy. He claims argues that his involvement was akin to Jackson and White, both of whom were involved with the runners below them.

To qualify for this enhancement, a defendant must be "a manager or supervisor (but not an organizer or leader)" and the criminal activity must involve five or more participants or be otherwise extensive. U.S.S.G. § 3B1.1(b). The "defendant must have exerted control over at least one individual within [the] criminal organization." *United States v. Lalonde*, 509 F.3d 750, 765 (6th Cir. 2007). When determining whether a defendant acts as a "manager" or a "supervisor" under § 3B1.1(b), courts look to "the defendant's relative responsibility," such as whether the defendant employed another person's help in carrying out the crime and directed that person's criminal efforts. *United States v. Henley*, 360 F.3d 509, 517 (6th Cir. 2004); *see also United States v. Munoz*, 233 F.3d 410, 416 (6th Cir. 2000) (upholding finding that defendant played a managerial role where defendant arranged for courier to deliver drugs). A defendant can also be considered a manager when he recruits individuals to participate in the criminal scheme. *United States v. Castilla-Lugo*, 699 F.3d 454, 460–61 (6th Cir. 2012). Moreover, the participants "managed or supervised, importantly, need not have been convicted or even charged"-- it is enough they were "aware of the criminal objective and knowingly offered their assistance." *United States v. Demerovic*, 811 F. App'x 967, 969 (6th Cir. 2020) quoting *United States v. Mitchell*, 295 F. App'x 799, 802 (6th Cir. 2008).

7

Thibou's objection should be denied.  This conspiracy had a clear hierarchy, with the leaders in India, Thibou just below them, and the drivers and runners below Thibou.  Thibou was trusted by the Indians, and he was the one who had direct contact with them. They provided Thibou with the names and locations of the fraud victims, and Thibou used that information to arrange for the runners to meet with the victims or collect  Both Jackson and White said that Thibou spoke to the Indian leaders on the phone or via WhatsApp as they were coordinating the meetings with victims.  Text messages retrieved from Thibou's phone show that he received the victims' names, addresses, and descriptions, and then arranged for runners to travel to meet with the victims or accept packages mailed by them.  He even paid for their airfare and travel.  Moreover, Thibou recruited White, Jackson, McNamara, and numerous others into the conspiracy.  He directed their activities and told them what to do.

Thibou's management of other co-conspirators is crystal clear when one looks at his text messages.  When, for example, McNamara traveled to meet with J.K. on October 14, 2021, Thibou sent her a text message with J.K.'s home address and asked McNamara how far it was from McNamara's home to J.K.'s  (PSR ¶ 28.)  McNamara responded, "I'm two hours and 45 minutes from that address."  (*Id.*)  Later that day, McNamara sent Thibou a text message saying, "We're heading there now."  (*Id.*) Thibou instructed her, "It's just a person to person transaction." (*Id.*)

On October 15, 2021, McNamara sent Thibou a text message asking, "Do you know if I'm going to the same place as yesterday."  (*Id.* at ¶ 30)  Thibou responded, "The same place."  (*Id.*) Later that day, Thibou sent McNamara a text that said, "How things going."  (*Id.* at ¶ 31.) McNamara responded, "We just got here."  (*Id.*) Thibou then said, "Let me know when you get done."  (*Id.*)  Later, McNamara sent Thibou a text to Thibou that said, "I'm done." (*Id.*) Thibou then asked, "He [Panchal] paid you yet."  (*Id.*)  McNamara responded, "No he hasn't paid me yet

8

but I still have the package at my feet." (*Id.*)  On October 24, 2021, McNamara reported to Thibou that she had just collected another package from J.K., when she sent him a text message that said, "Just got done."  (*Id.* ¶ 33.)  McNamara sent Thibou a similar text message after collecting a package from J.K. on November 16, 2021, in which she said, "I'm done.  Heading home now." (*Id.* ¶ 36).

Six other un-indicted co-conspirators said they either were recruited into the conspiracy by Thibou, or that he arranged for them to collect fraud proceeds from victims.  (*Id.* ¶¶ 170-76.) Unindicted co-conspirator C.S. said that he flew with Thibou to California and Arizona, where they met "middle-aged or older" people who gave them boxes. (*Id.* ¶ 170.)  Thibou took possession of the boxes and he never opened them in front of C.S.  (*Id.*)   Thibou recruited A.G. into the conspiracy and she travelled to Wisconsin, Iowa, Illinois, Colorado, Texas, Tennessee, Nevada, and Washington D.C. at his direction.  (*Id.* ¶ 171.)  J.A. said Thibou got her involved in the conspiracy when he paid her to accept delivery of mail packages at her house, and to allow him to use her bank account for the deposit of fraud proceeds.  (*Id.* ¶¶ 172-73.)  Likewise, D.J. said that Thibou asked her to accept the deposit of $30,000 in fraud proceeds.  (*Id.* ¶ 175.)

Even when conspirators like Jackson recruited members of the conspiracy, such as his girlfriend and the exotic dancer "Vicky," Thibou took over management of the new recruits' activities once they joined.  (*Id.* ¶¶112, 114-115.)   For example, Jackson introduced unindicted co-conspirator to M.B. to Thibou, who took over from there.  (*Id.* ¶ 114.)  M.B. said that Thibou paid for him to fly to North Carolina, Illinois, and California to pick up packages and paid him $300 for each trip, covered his hotel and flight expenses.  (*Id.* ¶ 174.)  This is corroborated by flight records (*Id.* ¶ 177)

9

Likewise, Jackson introduced Vicky to the conspiracy, but Thibou directed her where to go to meet victims and paid for her travel. (*Id.* ¶ 115.) Jackson gave Thibou the address of his ex-girlfriend in Kissimmee, Florida, but Thibou is the one who used it so that a package of fraud proceeds could be delivered there, and Thibou went to the apartment to pick up the package. (*Id.* ¶ 112.)

 Subpoena responses confirm that Thibou purchased numerous airline tickets for co-conspirators, including McNamara, Jackson, White and unindicted co-conspirators D.A., M.D., and C.S. (*Id.* ¶ 177.)

Both Jmyla White and Jorrel Jackson said that Thibou was that primary contact with the leaders of the conspiracy. (*Id.* ¶ 118-119, 125, 129.) Jackson never met or spoke with any of the Indians, but Thibou did and "knew everyone involved." (*Id.* ¶ 118-19.) Furthermore, Jackson did not keep any of the boxes he retrieved from victim, but instead gave them to Thibou. (*Id.* ¶ 113.)

White said that Thibou was trusted by the Indians and his role was to relay their messages to runners further down the conspiracy. (*Id.* ¶ 129.) Thibou communicated via WhatsApp with an Indian that went by "Jason," who gave Thibou the orders about where to receive packages. (*Id.* ¶ 125.) All of this demonstrates that Thibou was clearly a "manager or supervisor" of the conspiracy.

## II. Thibou is not entitled to a downward departure based on his 2015 marijuana conviction.

In his response to the initial presentence report, Thibou indicated that he intended to seek a downward departure pursuant to USSG §4A1.3(b) because he contends that his criminal history category substantially over-represents the seriousness of his criminal history or the likelihood that he will commit other crimes. In particular, he said that his October 2015 conviction for possession

of marijuana overstates his criminal history score.  In support, he cited comment note USSG §4A1.33(A)(ii), which provides as an example a defendant who received criminal history points from a sentence for possession of marijuana for personal use, without an attempt to sell or distribute it to another person.

Thibou's request for a downward departure should be denied.  First, although the charge was pled down to possession of cannabis, it appears Thibou had an intent to sell marijuana, which would make him unqualified for the departure.  He was originally charged with Armed Possession of a Controlled Substance With Intent to Sell/Deliver.  (PSR ¶ 223.)  According to court records, on April 6, 2015, Hillsborough County Sheriff's Department deputies initiated a traffic stop on a vehicle due to a seatbelt violation.  (*Id.*) Thibou was the front seat passenger, and the driver was unidentified in the report.  (*Id.*) The deputies observed the aroma of marijuana emitting from the vehicle and flakes of marijuana on Thibou's shorts.  (*Id.*)  A search of the vehicle revealed 20 grams of marijuana, one loaded 9mm handgun with two loaded magazines, a digital scale, and a bag containing 100 rounds of assorted ammunition.  (*Id.*)

Second, the standard for a departure under 4A1.13(b) is whether a defendant's criminal history category "substantially" over-represents the seriousness of his criminal history or the likelihood he will commit other crimes.  Here, Thibou has 10 prior convictions, 11 criminal history points, and has vividly demonstrated that he is likely to commit new crimes. Indeed, he joined the fraud conspiracy in this case less than three months after his Pennsylvania conviction for defrauding an elderly couple.  He is not entitled to a downward departure.

III.    **The Sentencing Factors.**

A.  **The need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.**

This is a very serious offense that involves the exploitation of elderly victims in a scheme that can only be described as exceptionally callous and cruel.   Some of the victims lost their life savings.  Some no longer have enough money to live on.   To induce the victims to part with hundreds of thousands of dollars, the conspirators lied to, frightened, isolated, and pressured them. Members of the conspiracy met many of the victims in person, who now feel unsafe.  It's hard to image what kind of person would engage in this type of behavior even once, much less after being caught once.   He is responsible for causing 29 victims to lose $3,200,549.

This scheme was intentionally designed to prey on vulnerable victims. The emotional distress caused to the victims was not an unintentional byproduct of the fraud: it was an essential component. By causing the victims to believe their bank accounts had been compromised, the members of the scheme induced them to part with tens of thousands, and sometimes hundreds of thousands, of dollars. The more distressed the victim, the more likely they were to pay. Victims interviewed as part of this investigation described the fear and distrust they now experience as a result of the fraud.  Some reported strains on their marriages or with their children.  They also reported feeling embarrassed, taken advantage of, less trusting, and less safe.

Many of the victims included in Thibou's loss calculation suffered substantial financial hardship:

- M.O., age 86, reported that the money she lost to this fraud would have paid for a year in her assisted living facility.

12

- B.R., age 70, reported that the money she lost to the fraud constituted 100% of her 401k retirement account. She works part-time and will have to continue working longer than expected due to the loss of these funds.

- M.R., age 69, lost one-third of his retirement account to this fraud. He is currently working with a debt relief company to pay his bills.

- P.D., who is 68 years old, had to take out a reverse mortgage to stay in her house and pay her bills because of the money she lost due to the fraud.  The funds she lost to fraud and the taxes she had to pay as a result of taking money out of her retirement accounts resulted in the loss of half of her retirement savings. She is also paying more for Medicare because her income was inflated by the withdrawals from her retirement accounts.

Both the size of this scheme and the vulnerable nature of the victims warrant a significant sentence.

### B.  The Need for Deterrence and to Protect the Public

Specific deterrence should be an important factor in Thibou's sentence.  He joined the conspiracy less than three months after being convicted in Pennsylvania for defrauding an elderly couple, and was on probation throughout his involvement.  He had no feelings whatsoever about the victims he defrauded.  When Jmyla White, who apparently had enough of a conscience to feel some remorse, asked Thibou, "Say something to make me feel better," Thibou responded, "There [sic] stealing from old white people an [sic] they eating big.  An helping me you and your daughter." (*Id.* at n.29)

Thibou has a lengthy criminal history, including prior convictions involving the possession of firearms, the sale of controlled substances, fleeing and eluding law enforcement, and resisting and obstructing. Notably, it appears that he has never served more than a year in jail, which may explain why he has been so quick to recidivate. Given his lengthy criminal history and his repeat offenses involving elderly victims, a firm sentence is warranted in this case.

The deterrence aspect of the Court's sentence should consider not only the magnitude of this conspiracy, but the staggering dimensions of elder fraud. According to the FBI's Internet Crime Complaint Center (IC3), victims over age 60 reported just shy of $1 billion in fraud losses in 2021. In 2022, the reported losses were more than $1.6 billion. And in 2022, that number nearly doubled, with victims over 60 reporting more than $3 billion in fraud losses. *See* FEDERAL BUREAU OF INVESTIGATION, INTERNET CRIME COMPLAINT CENTER, 2022 IC3 ANNUAL REPORT, at p. 5.[2] In 2023, the FBI reported that elderly victims lost $3.4 billion.

International frauds schemes like the one at issue in this case would not succeed without U.S.-based conspirators like Thibou, who collected money from the victims in the United States. Even the vulnerable and elderly victims in this case would likely have been tipped off that something was wrong if they were directed to send money to overseas accounts. The sentence in this case should be serious enough to deter individuals who calculate that they could make money through elder fraud. Individuals considering this type of conduct must understand that the legal consequences are not worth the risk.

### C.  History and Characteristics

---

[2] Available at https://www.ic3.gov/Media/PDF/AnnualReport/2022_IC3ElderFraudReport.pdf

Thibou was born in the U.S. Virgin Islands, but moved back and forth between Florida and the Virgin Islands as he grew up.  He is 32, but has very little work history.  He has a history of excessive alcohol, marijuana, and cocaine use.  He has one child, age 3, who lives with the child's mother.

### D.  Restitution

The sentence in this case should provide for restitution.  The United States requests restitution for the victims and in the amounts identified in ¶ 282 of the PSR.

### CONCLUSION

For the forgoing reasons, the United States requests a sentence of incarceration for Panchal, with an order to pay restitution.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Dated: October 17, 2024                    /s/ Clay Stiffler
CLAY STIFFLER
Assistant United States Attorney
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404

15