## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

**UNITED STATES OF AMERICA,**
        Plaintiff,

vs.

Case No. 1:23-cr-87-JMB
Hon. Jane M. Beckering

**EVERETTE THIBOU,**
        Defendant.

_____

### DEFENDANT'S SENTENCING MEMORANDUM
_____

**NOW COMES** the Defendant, Everette Thibou, by his counsel, Joshua Blanchard, and submits this Sentencing Memorandum in support of a sentence below the advisory sentencing guidelines. Such a sentence reflects the nature and circumstances of Mr. Thibou's offense and his history and characteristics, and is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).

### INTRODUCTION

### I.    UNRESOLVED OBJECTIONS TO PSIR AND SCORING

There is one unresolved objection to the sentencing guidelines. *See* PSR, ECF No. 349, PageID.2666. The current presentence report proposes to score a three-level enhancement for being a manager/supervisor. *Id.*

1

USSG §3B1.1(b) says to increase the offense level by three levels "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive".

The problem with assessing Mr. Thibou a manager/supervisor enhancement lies in the nature and scope of his role within the conspiracy. While Mr. Thibou did coordinate with other individuals involved in the scheme, his actions do not reflect the level of authority, control, or decision-making power characteristic of a manager/supervisor role. He operated under the direction of higher-level co-conspirators, primarily taking instructions and carrying out tasks without substantial autonomy. Moreover, he did not have decision-making authority over the larger operations, nor did he exercise control over the conspiracy's resources or strategic direction. Instead, Mr. Thibou's role was largely supportive and facilitative, functioning as a link between participants rather than directing or organizing the activities of others. Thus, while he was actively involved, his contributions do not rise to the level of a managerial or leadership role as defined by the sentencing guidelines.

Specifically, Mr. Thibou was acting under instructions from the primary conspirators in India who were responsible for contacting victims, defrauding them, and arranging the retrieval of the stolen monies. Mr. Thibou didn't possess have autonomy and decision-making authority. He did not exercise control or authority over the runners but merely conveyed directions from others without independently planning or organizing the broader scheme.

Although he may have facilitated the logistics, such as travel and banking arrangements, these tasks do not necessarily demonstrate managerial authority. The guideline's commentary emphasizes factors like decision-making authority, recruitment, and a right to a larger share of profits. Here, there is no evidence that Mr. Thibou had any such decision-making power or financial incentive beyond a basic operational role. He neither organized nor planned the criminal activity's overall scope and did not exercise control over others in a manner indicative of a true supervisory role. It appears that his involvement was of a similar level and scope to Ms. White and Mr. Jackson. Thus, his involvement falls short of the level of responsibility that §3B1.1(b) aims to address, making the enhancement inappropriate in this context.

## II.     NATURE AND CIRCUMSTANCES OF MR. THIBOU'S OFFENSE

Mr. Thibou pled guilty to the sole count of the indictment charging conspiracy to commit wire fraud, relating to allegations that he conspired to steal money from domestic victims of an Indian call center scam.

He was part of a larger operation aimed at defrauding individuals through deceptive practices. While his role was non-violent, he knowingly participated and contributed to the scheme, which resulted in serious financial harm to multiple victims. Mr. Thibou has accepted responsibility for his actions and acknowledges his involvement. In counsel's view, he was not a leader in the scheme, but his actions were part of a coordinated effort that took advantage of others for financial gain. Mr.

Thibou has expressed remorse and has cooperated with the legal process, choosing to plead guilty to the sole count in the indictment.

### III. MR. THIBOU'S HISTORY AND CHARACTERISTICS.

Everette Jahmal Thibou's life is one marked by significant trauma, hardship, and resilience. Born on August 28, 1992, in St. Thomas, U.S. Virgin Islands, he was raised in a fractured and often chaotic environment, largely shaped by violence, instability, and the absence of a consistent parental figure. Despite these struggles, Mr. Thibou has shown a capacity for survival, a desire for connection, and moments of self-awareness that demonstrate he has the ability to be a contributing member of society in the future.

Mr. Thibou's early years were overshadowed by a difficult relationship with his father, Everette Thibou, a man with whom he had a distant and strained connection. His father, illiterate and abusive, subjected young Everette to routine (and often cruel) physical punishment. This violence often seemed arbitrary, with Mr. Thibou noting that he was singled out for the misdeeds of other children and often felt like the "black sheep" of the family, compared to his stepsiblings. His father's substance abuse, involving both alcohol and marijuana, compounded the dysfunction within the family.

Despite the instability at home, Everette's relationship with his mother, Persis McCall, was more positive. Ms. McCall, a native of St. Kitts, faced her own challenges, particularly related to immigration, which impacted her ability to find consistent employment in the Virgin Islands. Nevertheless, she provided a source of emotional

4

support for her son, and their relationship has remained strong throughout his life. Everette spoke of his mother with warmth, indicating that they maintained regular contact, even as she moved to New York in pursuit of better opportunities.

As a child, Everette faced violence not only at home but also within his community. By the time he was five, he had already witnessed severe acts of violence. One particularly scarring event occurred when he was struck in the head with a glass bottle by an unknown older man. He also recalled being involved in a shooting incident, in which he had to hide after a drive-by shooting took place nearby. These early experiences of trauma and violence undoubtedly shaped his outlook on life and contributed to the challenges he faced later on.

Mr. Thibou's sense of instability followed him into his teenage years. He remembers being illegally detained by police officers in St. Thomas, one of whom even placed a gun to his head—an experience that left him deeply traumatized. This event seems to have been a turning point for him. He began using drugs and alcohol as a way to cope with the lingering stress, anxiety, and nightmares triggered by this and other traumatic experiences. His substance abuse began early, with daily use of alcohol, marijuana, and cocaine starting at the age of 13. While he has expressed awareness of the negative impact that his drug use has had on his relationships, the roots of this behavior seem firmly planted in the traumas he endured as a child.

Everette's relationship with his father became increasingly strained as he grew older. At the age of nine, he moved to Tampa, Florida, to live with his father, but this new living arrangement did not provide the stability he needed. His father was

5

incarcerated intermittently, forcing Everette to move back and forth between Tampa and the Virgin Islands. During one of these periods in the Virgin Islands, he lived in a plywood shack with an outhouse, underscoring the extreme poverty and instability that marked his childhood. Even when residing with his father, the violence did not stop, and Everette was subjected to continued emotional and physical abuse.

In addition to the violence at home, Everette was exposed to significant trauma within his broader family network. He witnessed his father abuse his siblings, and his half-brother, Kross, faced a life-threatening battle with cancer, which affected Everette. His relationship with his siblings was complex, but he has maintained a closer bond with his sister Angelita and brother Johnny. Both siblings often turned to him for advice, further highlighting his desire to help those around him despite his own struggles.

Throughout his adult life, Everette sought solace and stability in various ways, but he often found himself drawn into situations that worsened his difficulties. He entered a romantic relationship with Daija Cole, with whom he has a son, Izair. While Everette has expressed a desire to be a good father and provide guidance to his son and Daija's children from a previous relationship, his struggles with substance abuse and mental health challenges have strained his relationships. Despite these challenges, he remains committed to being involved in his son's life, seeing parenthood as one of the positive aspects of his personality.

As he reached adulthood, Everette's experiences of trauma began to manifest in his choices. He acknowledged that his use of drugs and alcohol was a way to "take

the edge off" the anxiety, nightmares, and emotional turmoil he had experienced throughout his life. His involvement in the criminal justice system, including his role in this conspiracy, further complicated his life. While he acknowledges the harm his actions caused, he has expressed deep regret and disappointment in himself. Everette understands that his decisions have seriously harmed the victims, will lead him to miss important moments with his family, and he has indicated a desire to change his life going forward.

Mr. Thibou's childhood friend, Jashire O'Kay, describes him as a "dependable person" who has always been a "loving and caring friend, and family member, especially to his mother". She describes how he was always willing to listen and looked out for others. *See* Support Letters, Ex. A.

His mother, Persis McCall, describes Mr. Thibou as a child who took care of her before he went to live with his father. She describes him as a kind person who always went out of his way to make sure his friends had something to eat. *See* Support Letters, Ex. A.

In many ways, Mr. Thibou's life has been a series of attempts to find stability and meaning in the face of overwhelming trauma. From his early experiences of violence and abuse to his struggles with substance abuse and criminal behavior, he has been shaped by the circumstances of his upbringing. However, he has also shown moments of self-reflection and a desire to break the cycle of trauma. He has expressed interest in participating in substance abuse treatment programs and pursuing

vocational training during any period of incarceration, indicating that he still holds hope for a better future.

While his choices have led to significant negative consequences for himself and others, they are also deeply intertwined with the trauma he endured from an early age. His desire to help those around him, even at his own expense, speaks to a fundamentally compassionate nature, one that has been at odds with the survival mechanisms he developed in response to his traumatic past. As he moves forward, Everette Thibou's journey toward healing and accountability offers hope that he can overcome his past and build a more stable future for himself and his family.

### IV. TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE.

As the Court is well aware, §3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed…to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense." These sentencing objectives set forth in § 3553(a)(2)(A) are generally referred to, collectively, as "retribution," which has been defined as follows:

> First, retributive, or "just desserts," theory considers only the defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise. Second, retribution examines the actor's degree of **blameworthiness** for his or her past actions, focusing on the offense being sentenced. . . . Third, the degree of blameworthiness of an offense is generally assessed according to **two kinds of elements**: the **nature and seriousness of the harm caused or threatened** by the crime; and the **offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity**.

8

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005) (emphasis supplied).

Any sentence imposed on Mr. Thibou will be long. A particularly lengthy sentence for Mr. Thibou is unnecessary to reflect the seriousness of the offense, promote respect for the law, or provide just punishment. His involvement in the crime was non-violent and influenced by significant personal challenges, including a history of trauma. While the offense was undoubtedly serious and harmed many people severely, Mr. Thibou has accepted responsibility and shown genuine remorse, demonstrating an understanding of the law's importance. A shorter sentence, combined with rehabilitative support, would appropriately address the offense's gravity while promoting respect for the law and accountability. This approach balances justice with an opportunity for meaningful change and reintegration.

## V. TO AFFORD ADEQUATE DETERRANCE TO CRIMINAL CONDUCT.

Section 3553(a)(2)(B) requires the court to consider "the need for the sentence imposed...to afford adequate deterrence to criminal activity." A leading scholar on federal sentencing is debunking the myth that lengthy sentences have a deterrent effect. She writes:

> Indeed, while many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the question for the judge is "marginal deterrence," *i.e.*, whether any particular quantum of punishment results in increased deterrence and

9

> thus decreased crime. Here the findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence. "Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

Amy Baron Evans, Sentencing By the Statute (April 27, 2009, revised December 21, 2010),https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/ sentencing_resources/sentencing-by-the-statute.pdf. It appears there is little or no positive correlation between the length of sentence and general deterrence. More important is that people who commit crimes be held accountable. Mr. Thibou will be held accountable: he has been apprehended, had accepted responsibility, faces serious incarceration, and a lengthy period of supervised release.

## VI. TO PROTECT THE PUBLIC FROM FURTHER CRIMES BY MR. THIBOU.

A lengthy sentence is not necessary to protect the public from Mr. Thibou. His criminal actions are rooted in a life of trauma, poverty, and instability, rather than a persistent criminal mindset. His non-violent, financially motivated offenses show that he does not pose a physical threat to the community.

Mr. Thibou has accepted responsibility and shown genuine remorse, reflecting his willingness to change. His guilty plea indicates that he understands the impact of his actions, signaling a readiness for rehabilitation rather than extended incarceration. Additionally, he has a strong support system in his family, who remain a positive influence. His desire to be present for his son further underscores his commitment to a stable, law-abiding life.

Mr. Thibou's criminal record shows no pattern of violence. Instead, it demonstrates someone without the tools to succeed trying to support himself through illegal means: drug dealing and theft. This, coupled with his interest in substance abuse treatment and vocational training, suggests that the risk of recidivism can be mitigated by ensuring Mr. Thibou leaves custody with the tools to earn an honest living. A period of supervised release after his sentence with appropriate monitoring and counseling, would effectively address the underlying issues of trauma and substance abuse, providing him the opportunity for genuine rehabilitation.

Extended incarceration risks perpetuating a cycle of criminality that is not in the public interest. Instead, alternative, community-based sanctions can protect the public while supporting Mr. Thibou's eventual reintegration. These measures offer a balanced approach, addressing the root causes of his behavior without entrenching him in the criminal justice system.

In summary, Mr. Thibou's circumstances mitigate against a particularly lengthy sentence. His actions reflect the impacts of trauma and a misguided approach to supporting himself. By focusing on rehabilitation, the court can ensure public safety and give Mr. Thibou the tools needed for a positive future.

**VII.   THE NEED FOR THE SENTENCE TO AVOID UNWARRANTED SENTENCING DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT.**



Mr. Thibou is the last defendant to be sentenced in this case, except for the lead defendant, Mr. Patel, who has not yet appeared. Of the five co-defendants sentenced, the sentences have ranged from 51 to 97 months. The mean sentence is 73.4 months; the median is 78 months.

According to the United States Sentencing Commission, in years 2017 through 2023, for offenders convicted under USSG §2B1.1, with criminal history category V and who were in Zone D, the median sentence imposed in the Sixth Circuit was 41 months and the mean sentence was 45.



**Average and Median Imprisonment Length**
Fiscal Year 2017,2018,2019,2020,2021,2022,2023

The figure includes the 86 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2017,2018,2019,2020,2021,2022,2023; Circuit: 6th Circuit; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: D; Criminal History: V; Career Offender Status: All

The bottom-of-the-guideline sentence recommended by the United States Probation officer is nearly four times as long as the average sentence imposed by judges in this Circuit for offenders in CHC V and Zone D. It is more than double the average sentence for defendants in this case. The two longest sentences imposed in this case are for defendants who have larger restitution obligations than Mr. Thibou, indicating that they had more extensive involvement in the conspiracy.

A sentence within the guideline range will result in an unwarranted sentencing disparity, both compared to his co-defendants and to similarly situated wire fraud defendants in this circuit.

13

### VIII. TO PROVIDE MR. THIBOU WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER.

To effectively address Mr. Thibou's rehabilitation needs, specific programs within the Bureau of Prisons (BOP) can provide him with essential support. Given his history of substance abuse, the Residential Drug Abuse Program (RDAP) is crucial. RDAP offers intensive, evidence-based treatment aimed at reducing dependency, enhancing self-awareness, and building healthier coping strategies. Completion of RDAP can also reduce recidivism, supporting his long-term success post-release.

Additionally, a mental health evaluation and trauma-informed therapy through BOP's Mental Health Services would be highly beneficial for Mr. Thibou. This type of therapy addresses the impact of past trauma on his behavior and equips him with tools to manage stress and emotional challenges constructively. It can foster resilience and self-regulation, which are key to his rehabilitation.

For vocational development, BOP's Occupational Education Programs offer training in various trades, such as automotive repair, carpentry, HVAC, and culinary arts. These programs not only provide valuable skills but also certifications that can improve Mr. Thibou's employability and help him build a stable, lawful life upon reentry. Additionally, participation in Literacy and GED Programs would enhance his educational foundation, enabling him to navigate future opportunities with confidence.

Through these targeted programs, the BOP can address Mr. Thibou's unique needs, supporting his transition into a productive and law-abiding future.

### IX. A DOWNWARD VARIANCE FROM THE ADVISORY GUIDELINE RANGE IS APPROPRIATE.

Courts are not required to impose a sentence within the range recommended by the United States Sentencing Guidelines. *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738 (2005). The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 128 S.Ct. 558, 564 (2007) (internal quotations omitted); *Gall v. United States*, 128 S.Ct. 586, 602 (2007) (same). Courts "may vary [from the Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines". *Kimbrough*, 128 S.Ct. at 570.

When a Court disagrees with the Guidelines, the courts of appeals may not "grant greater factfinding leeway to [the Commission] than to [the] district judge." *Rita v. United States*, 127 S.Ct. 2456, 2465, 2468 (2007). The Guidelines deserve some level of deference from the Court when they are based on (1) empirical evidence of pre-guideline sentencing practice and (2) periodic review/revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *Rita,* 127 S.Ct. at 2464-65. However, as the Supreme Court noted, "not all of the Guidelines are tied this empirical evidence." *Gall*, 128 S.Ct. at 594 n.2. When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it fails to achieve the purposes of sentencing, as

15

set forth in 18 U.S.C. § 3553(a), even in the average case. *Kimbrough*, 128 S.Ct. at 575.

Because the "Guidelines are not the only consideration," the Court, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate," "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by the party." *Gall* at 596. The Court must "impose a sentence sufficient, but not greater than necessary" to achieve the goals of sentencing. *Id* at 597. In doing so, the Court must independently evaluate the appropriate sentence in light of § 3553(a), consider arguments that the guidelines should not apply on general policy grounds or case specific grounds, but "may not presume that the Guidelines range is reasonable." *Rita,* 127 S.Ct. at 2463, 2465, 2467-68; *Gall*, 128 S.Ct. at 596-97.

## APPLICATION TO MR. THIBOU'S CASE

A downward variance from the advisory guideline range is justified in Mr. Thibou's case, given the mitigating factors and his rehabilitation potential. The Supreme Court in *Booker*, *Gall,* and *Kimbrough* clarified that the Guidelines are advisory and not mandatory, allowing the Court to consider policy reasons and individual circumstances when imposing a sentence. In this case, adhering strictly to the Guidelines would not fully align with the purposes of sentencing under 18 U.S.C. § 3553(a).

Mr. Thibou's offense, while serious, was non-violent and stemmed from challenging personal circumstances, including trauma and substance abuse issues.

16

The offense was serious and sophisticated, but Mr. Thibou's role in it was at a lower level than the people calling the shots in India and collecting the lion's share of the profits. Recognizing these factors, the Court can exercise its discretion to impose a sentence that acknowledges his acceptance of responsibility and willingness to change.

Incorporating programs available through the Bureau of Prisons (BOP) into Mr. Thibou's sentence, such as the Residential Drug Abuse Program (RDAP) and trauma-informed mental health services, can effectively address his specific needs. Additionally, the BOP's vocational training programs would equip him with essential skills for a stable, law-abiding future.

A downward variance would ensure that Mr. Thibou's sentence is "sufficient, but not greater than necessary" to meet sentencing objectives, balancing public safety with an opportunity for his meaningful rehabilitation and reintegration.

## X.    CONCLUSION

Because a sentence below the advisory guideline range would be "sufficient, but not greater than necessary" to accomplish the goals of sentencing under 18 U.S.C. § 3553(a), Mr. Thibou requests a downward variance to a sentence of 100 months.

                                        Respectfully submitted:
                                        **BLANCHARD LAW**
                                        Attorneys for Defendant

Dated: October 16, 2024          <u>/s/ Joshua A. Blanchard</u>
                                        Joshua Blanchard (P72601)
                                        309 S. Lafayette St., Ste. 208
                                        P.O. Box 938
                                        Greenville, MI 48838
                                        616-773-2945
                                        josh@blanchard.law